**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| REBOOT LABS, LLC dba PLUNGE<br><br>Plaintiff,<br><br>-against-<br><br>COVER GENIUS WARRANTY SERVICES, LLC<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | CASE NO.<br><br><br>**COMPLAINT**<br><br>***Jury Demand Endorsed Hereon*** |

For its Complaint against the Defendant, the Plaintiff states as follows:

## Introduction

1. In May of 2023, Defendant Cover Genius Warranty Services, LLC ("Cover Genius") agreed to sell and administer 3-year and 5-year extended warranties to purchasers of Plunge's cold plunge tubs (the "Plunge Agreement"). Cover Genius should have known its attendant risks and obligations—the warranties were sold into a new industry, covering customer claims on an even newer product. But when confronted with the actual warranty obligations it had accepted, Cover Genius promptly sent notice it would nonrenew the Plunge Agreement at conclusion of its initial term in May of 2026.

2. Nonrenewing the Plunge Agreement did not eliminate Cover Genius' pending and future obligations to approximately 14,000 extended warranty holders who had purchased its warranties on Plunge products. Warranty obligations to those customers stretch into 2029—and Cover Genius does not want to perform.

3. Upon nonrenewing the Plunge Agreement, Cover Genius drastically changed the claims process for Plunge warranty holders. Its new process systematically evades Cover Genius'

warranty obligations to consumers (Plunge customers), and often does so in a way that deceives, frustrates, and confuses Plunge customers into believing that (i) Plunge is the cause of the customers' warranty claim problems, or (ii) Plunge is Cover Genius' partner in causing the customers' warranty claims problems.

4. Cover Genius uses a bag of claims-administration tricks to accomplish this result, including:

- Necessarily relying on Plunge to diagnose the cause of a unit's breakdown and recommend the fix, only to baselessly dispute or disparage Plunge's diagnosis to the customer and deny the valid claim.
- After baselessly disputing or disparaging Plunge's diagnosis and repair recommendations to the customer, approving only a portion of the recommended parts and repairs, which inevitably causes a recurrence of the same breakdown—at which point Cover Genius falsely passes blame and responsibility to Plunge to cover the second repair under Plunge's manufacturer's parts warranty.
- Ignoring customer communications and slow-walking administration of customers' warranty claims, while withholding claim approvals for weeks, intending that frustrated customers will abandon valid claims, or will hire Plunge to repair their unit—at which point Cover Genius can declare the repairs "unauthorized" and thus contractually excluded from coverage.
- Requiring customers (often after a needlessly delayed claim approval) to prepay hundreds or thousands of dollars for diagnostics and repairs and then to wait unreasonably long for reimbursement (if it ever comes at all).

5. Cover Genius peppers these practices with false statements leading customers to believe that Plunge causes or participates in these frustrating decisions and delays, including Cover Genius' repeated (false) references to its own decisions as decisions supposedly made by "our partner Plunge."

6. This misconduct is not a mere mistake or misunderstanding. Cover Genius faces several years of warranty claims under many thousand pending warranty policies that it does not want to honor. Cover Genius knows the warranty business, and knows the backlash a manufacturer

suffers from customers dissatisfied by mishandled warranty claims.[1] Indeed, Cover Genius has repeatedly used that prospect as leverage against Plunge, telling Plunge that customer dissatisfaction over Cover Genius' warranty claims practices "will hurt you [Plunge] more than us [Cover Genius]."

7. Cover Genius' scheme and course of conduct seeks not only to evade paying consumers' warranty claims but often to force Plunge to pay them. Cover Genius intends that intensifying customer anger and confusion will pressure Plunge—desperate to save its brand and business—into paying Cover Genius' warranty obligations. And the scheme is taking root. As described below, Plunge's reputation and sales are suffering as Plunge customers post dozens of negative public reviews tied directly to warranty maladministration, including statements such as:

- "I will not buy a Plunge again"
- "this [warranty] experience has destroyed my confidence in Plunge"
- "I WOULD NOT buy from them again."
- "I will be removing Plunge from our website and can no longer confidently recommend it to my patients when the warranty process has left me without a functioning product and no clear path to resolution."
- "the warranty company that I bought the warranty from through you guys is awful as well. Please try to do better, this is terrible. *I will never recommend Plunge because of that only. The unit itself is great*" (emphasis added).

Plunge is a new and growing company that cannot withstand such an onslaught. This action seeks to remedy Cover Genius' course of misconduct, which violates federal and state law.

---

[1] Cover Genius touts its service as a way to strengthen brand and customer relations by offering "hassle-free claims" and a "frictionless experience" for customers of its customers. (*See* https://covergenius.com/platform/xcover). And Cover Genius, Inc.'s founder and CEO acknowledged that an unsatisfactory insurance or claims experience causes customer "churn and backlash" against a manufacturer's brand. *See* Kyle Wiggers, *Cover Genius Lands $70M Infusion to Grow Its Embedded Insurance Business*, TechCrunch (Nov. 1, 2022), https://techcrunch.com/2022/11/01/cover-genius-lands-70m-infusion-to-grow-its-embedded-insurance-business/.

**Parties, Jurisdiction and Venue**

8. Plaintiff, Reboot Labs, LLC ("Plunge"), is a California limited liability company doing business under the name "Plunge." Plunge's principal place of business is in Placer County, California. Plunge manufactures and sells cold plunge tubs and other related consumer products throughout the United States and internationally. Its members are two individuals who reside in the State of California.

9. Cover Genius is a Delaware limited liability company, with its principal place of business in New York County, New York. Cover Genius sells and administers warranty products and affiliated service contracts for consumer goods, throughout the United States. It is owned and controlled by its sole member, Cover Genius, Inc., a Delaware corporation with its principal place of business in New York County, New York.

10. This court has jurisdiction over the parties and the claims under 28 U.S.C. § 1332 because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different States. Plunge's members are both residents of the state of California. Cover Genius' sole member is a Delaware corporation with its principal place of business in New York. The Court also has jurisdiction under 28 U.S.C. §1331 because Plaintiff asserts claims arising under the federal law (15 U.S.C. § 1125(a)(1)(A)) accompanied by state law claims over which the Court has supplemental jurisdiction under 28 U.S.C. §1367.

11. Venue rests properly in this Court under 28 U.S.C. § 1391(b)(1) and (2) because the Defendant resides in this judicial district and a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

## **Factual Allegations**

12. Plunge manufactures cold plunge tubs and sells them directly to consumers. The United States market for consumer cold plunge tubs only meaningfully began in approximately 2018, and grew markedly during and after the Covid-19 pandemic.

13. Plunge entered the new and burgeoning consumer market for cold plunge tubs in late 2020. Its innovative product and customer service culture quickly fostered its growth into the country's largest direct-to-consumer cold plunge manufacturer.

14. Because Plunge sells a consumer product which requires a substantial expenditure by its customers, it sought a relationship with a reliable provider of long term warranties. The peace of mind accompanying an extended warranty is crucial to a Plunge customer's decision to buy a cold tub.

### **Cover Genius agrees to provide extended warranty services in a new industry**

15. During discussions in early 2023, Cover Genius persuaded Plunge that it was the best warranty provider for Plunge customers, based on Cover Genius' size and experience with the world's largest companies, such as Amazon, eBay, Wayfair and many others.

16. As a result, on or about May 12, 2023, Cover Genius and Plunge executed an agreement identified as an "Order Form" (drafted solely by Cover Genius) whereby Cover Genius agreed to provide extended product warranty services to Plunge (the "Plunge Agreement"). A true copy of the Plunge Agreement is attached hereto as **Exhibit 1**.

17. The Plunge Agreement identified a start date of May 12, 2023 and an initial term of three years, with subsequent automatic one-year renewal terms unless either party terminated the order form under its terms.

18. Under the Plunge Agreement, Cover Genius offered Plunge customers who purchased cold plunge tubs the option to purchase either a 3-year or a 5-year extended warranty "Product Protection Plan" (commencing after the expiration of Plunge's 1-year manufacturer's warranty) to be administered through Cover Genius' warranty service platform known and branded as "Clyde Technology Services" ("Clyde").[2]

19. During the term of the Plunge Agreement, Cover Genius also offered and sold Plunge customers extended warranty protection plans administered under Cover Genius' warranty service platform known and branded as "XCover." Cover Genius touts its XCover platform as one that "makes it simple for the world's largest companies to offer tailored protection directly to their customers." *See* https://covergenius.com/platform/xcover.com. It reassures companies like Plunge that the XCover platform ensures "your customers get peace of mind and a personalized experience," through "a frictionless experience … shown to reduce support burden for partners." *Id*.

20. Plunge customers who purchased a Clyde or XCover warranty protection plan were entitled to receive covered repairs for "mechanical/electrical breakdowns" in the Plunge product.[3] If repair was unsuccessful (as defined by the warranty) the customer was entitled to replacement of the product with "a product of comparable performance." A true copy of a sample XCover Product Protection Plan is attached hereto as **Exhibit 2**.

---

[2] According to its public statements, Cover Genius acquired the assets of Clyde Technology Services on or around March 14, 2023. Cover Genius announced that its acquisition of Clyde would "assist Cover Genius' continued expansion into the medium-sized e-commerce segment." See https://covergenius.com/company/news/cover-genius-acquires-clyde.

[3] Cover Genius' XCover Service Agreement for the warranty plans defined "Mechanical/Electrical Breakdown" as "an operational, mechanical, or electrical failure due to a defect in materials or workmanship, or normal wear and tear; occurring during normal use" of the product.

21. Clyde and XCover are branded platforms owned by Cover Genius; they are not independent entities. Clyde, XCover and Cover Genius are sometimes herein referenced interchangeably, or collectively, as "Cover Genius."

22. In May of 2023, little if any extensive long-term data existed to evaluate and forecast product life expectancy, failure, or warranty claim rates under the proposed extended warranty program. The residential cold plunge tub market was relatively new, and Plunge was selling a first-generation product with no prior extended warranty provider or extended warranty claim experience. But Cover Genius knew all of these things and trumpeted its warranty underwriting and administration expertise when it committed to issue and honor 3-year and 5-year warranty protection plans covering claims for mechanical and electrical breakdowns (whether caused by product defects or wear and tear) of Plunge tubs.

23. To administer Plunge customers' warranty claims as obligated, Cover Genius faced several important logistical issues. For example, Cover Genius required a source of replacement parts and a network of service technicians who could repair mechanical/electrical breakdowns in the Plunge customers' products. When it entered the Plunge Agreement in 2023, Cover Genius knew that no aftermarket existed for Plunge replacement parts; Plunge was the only available provider. And Cover Genius knew that no network of skilled and experienced service technicians existed to perform repairs required by Plunge customer's claims, beyond the network of independent contractor technicians Plunge had developed and trained.

24. The Plunge Agreement included no express terms governing these logistical issues. Consequently, Cover Genius and Plunge agreed to, commenced, and engaged in the extended practice whereby Cover Genius directed customers with warranty claims to Plunge. Under the parties' custom and practice, Plunge would diagnose whether a repair was required and advise the

necessary fix. Cover Genius would then make warranty coverage decisions and administer the claim.

25. When a customer's covered warranty claim required repair and replacement of parts, Plunge would arrange and pay for a technician to perform the repairs and install replacement parts at no cost to the tub owner, and Plunge would subsequently invoice Cover Genius for reimbursement of the cost of the parts and the technician's time. Cover Genius would pay Plunge's prevailing terms for diagnosis, repair parts, and technician labor (which could vary depending on geography, complexity of the repair, or other factors).

**Plunge under-invoices Cover Genius before correcting; Cover Genius nonrenews the agreement**

26. Throughout 2023 and 2024, and into 2025, Cover Genius administered warranty claims for Plunge customers under this practice. Regrettably for Plunge, its customer service team—while reliably supplying the necessary replacement parts and paying technicians to perform customer's warranty repairs—frequently failed to invoice and demand reimbursement from Cover Genius of Plunge's expenditures from satisfying those customer warranty claims. This administrative failure by Plunge resulted in Cover Genius escaping its responsibility to reimburse Plunge for hundreds of customer warranty claims in 2023 and 2024, amounting to millions of dollars in unrecouped expenses by Plunge. It also resulted in Cover Genius experiencing (but apparently ignoring) an artificially depressed level of claim costs on the Plunge warranty protection plan business.

27. In late 2025, incidental to a restructuring of Plunge's management and finance team, Plunge discovered this history of unreimbursed funds relating to Cover Genius warranty claims. Plunge's new finance and management team performed a thorough evaluation and review of the terms under which Cover Genius warranty claims were handled, including Plunge's

administrative process for seeking reimbursement for replacement parts and service technician payments. Plunge thereafter began more thoroughly to report and seek reimbursement of expenses from servicing extended warranty claims.

28. Upon then experiencing weeks of normalized claims expenses, Cover Genius moved to end the Plunge Agreement. While the Plunge Agreement only required 30 days' advance notice of nonrenewal, Cover Genius did not wait—on February 12, 2026 (90 days before the expiration of the initial term), Cover Genius provided Plunge with a written notice advising of "Cover Genius's intention not to renew the [Plunge Agreement] when the Initial Term (as defined in the [Plunge Agreement]) expires on May 11, 2026." A copy of the notice is attached hereto as **Exhibit 3**.

29. The February 12, 2026 Cover Genius non-renewal also notice stated that "[b]arring a subsequent agreement, as of the Order End Date [May 11, 2026, as defined in the Plunge Agreement], there shall be no ongoing obligations between the Parties."

30. As of February 12, 2026, Cover Genius still faced future obligations under thousands of warranty product protection plans (of either 3-year or 5-year durations) sold to Plunge customers, and would face such obligations for years after the End Date of May 11, 2026.

**<u>Cover Genius' post-nonrenewal misconduct harms consumers and Plunge</u>**

31. Upon sending its February 12, 2026 non-renewal notice to Plunge, Cover Genius began to delay or disregard its obligations to administer Plunge customers' outstanding and incoming warranty claims. Additionally, Cover Genius failed to pay dozens of outstanding Plunge invoices for reimbursement of costs for replacement parts and technician services related to Plunge customers' warranty claims. By April 29, 2026, Cover Genius had failed to pay such Plunge invoices dating back to February of 2026 in an aggregate amount exceeding $700,000.

32. As the May 11, 2026 Order End Date approached, Cover Genius and Plunge engaged in discussions regarding a process for Cover Genius to administer Plunge customers' pending and future warranty claims (by May 11, 2026, Cover Genius would remain obligated on approximately 14,000 open warranty protection programs). Cover Genius proposed executing a "vendor agreement" with Plunge, on terms that would favor Cover Genius and upend the foundational financial fairness and feasibility of the parties' relationship. During these discussions, Cover Genius' executives sought to leverage Plunge customers' growing dissatisfaction with Cover Genius' warranty claim maladministration—threatening that if Plunge did not accede to Cover Genius' demands for a favorable vendor agreement, customer wrath would fall on Plunge more than Cover Genius. But at this point Cover Genius was neglecting customer warranty claims and still owed Plunge over $700,000 in unreimbursed warranty claims-related expenses. So Plunge advised that negotiations of a vendor agreement must await Cover Genius satisfying overdue Plunge invoices. Cover Genius did not pay Plunge, and no vendor agreement was tendered or executed.

33. Instead, Cover Genius declared control over the post-nonrenewal warranty claims and repair procedure. It transformed the procedure into a customer "self repair" process, whereby customers with covered warranty repair claims would pay Plunge for the parts and services and then seek reimbursement from Cover Genius (Cover Genius still needed Plunge's expertise and network of technicians to diagnose the cause of covered breakdowns and recommend and implement the fix). This new system required Plunge customers to come out of pocket for warranty claim-related services (previously Plunge paid the cost and invoiced Cover Genius for reimbursement) and left Plunge and its customers subject to Cover Genius' claims administration and payment whims.

34. By June 29, 2026, Cover Genius' aggregate amount of unpaid invoices for warranty claims-related expenses had increased to nearly $900,000, representing amounts due for claims dating back to February of 2026.

35. Under threat of suit by Plunge, Cover Genius finally paid Plunge the balance due for warranty claims parts and services on July 1, 2026. However, Cover Genius thereafter intensified its neglect and obstruction of customer warranty claims. Cover Genius continued to simply ignore many customer warranty-related inquiries, often for weeks at a time. When claims were actually addressed, Cover Genius persistently fabricated excuses to avoid paying customers' claims.

36. Since Cover Genius implemented its customer "self repair" system in May of 2026, Plunge customers have continued to submit warranty repair claims at rates similar to Q1 and Q2 of 2026. However, Cover Genius has drastically reduced the number and ratio of paid warranty claims for Plunge's customers. Cover Genius had paid customer warranty claims at an average of 500 claims per month from November of 2025 through April of 2026. But paid claims dived by July of 2026 (294 paid claims), August of 2026 (354 paid claims), September of 2026 (172 paid claims) and October of 2026 (95 paid claims). At the same time, the percentage of claims paid by Cover Genius has nosedived. While 93% of claims presented in May of 2026 were paid, the rate plummeted by July of 2026 (71%), August of 2026 (41%), September of 2026 (18%) and October of 2026 (13%). These results represent tens of thousands of dollars in unreimbursed repair costs advanced by Plunge customers on warranty claims, attributable to Cover Genius' maladministration of claims, as discussed more below.

37. On September 10, 2026 Plunge and Cover Genius conducted a phone call to discuss Plunge's concerns about the deterioration in Cover Genius' claims payment and administration,

and the resulting effects on Plunge and its customers. Cover Genius responded by complaining that it was receiving $1 million in customer warranty claims per month—all while refusing to acknowledge its known risk when it entered the 2023 agreement, and further refusing to acknowledge that it experienced artificially low claims costs due to Plunge's failure to robustly invoice Cover Genius for warranty repair costs at the outset of the Order Form agreement's term.

38. During the September 10, 2026 call, Cover Genius threatened that Cover Genius would be demanding "an audit" of Plunge's historical diagnostics and recommendations on warranty claims (without citing any contractual or other legal need or entitlement to such an audit). Cover Genius' Senior Vice President of Insurance Strategy also repeated a form of prior threats, to the effect that unless Plunge submitted to an audit of claims and a favorable vendor agreement for Cover Genius, Cover Genius' new claims handling tactics "would hurt you [Plunge] more than us [Cover Genius]."

39. Familiar with its own industry, Cover Genius correctly understood the effect of its improper claims practices—they were hurting Plunge more than Cover Genius. Plunge suffered intensifying customer dissatisfaction and brand harm from Cover Genius' actions. Many Plunge customers do not understand that Plunge cannot control payment decisions on extended warranty claims. The customer paid a substantial sum for a product and a warranty contract; they thought they had protection from an extended warranty; and when they do not receive adequate warranty service they blame Plunge along with (or instead of) Cover Genius, regardless of which party is actually at fault.

40. For example, on August 26, 2026, a Plunge customer posted a 1-star review of Plunge on the internet website, Trustpilot, entitled "Plunge Customer Service and Warranty Support—Don't Meet Expectations." His public comment included statements that "Plunge

abdicates their obligation for their extended warranty to XCOVER" and that "[t]o date XCOVER has not made an assessment [of his warranty claim] and it's been more than 4 weeks." He further stated, "[b]ottom line Plunge and their 3rd Party Warranty Provider XCOVER are not customer service orientated and their warranties are, at this point from my perspective, worthless and misleading to consumers."

41. On September 14, 2026, another Plunge customer posted a 1-star review on Trustpilot, stating that "[t]his order was an warranty issue and it has taken forever to process, and is absolutely terrible. Xcover, the warranty company that I bought the warranty from through you guys is awful as well. Please try to do better, this is terrible. *I will never recommend Plunge because of that only. The unit itself is great*" (emphasis added).

42. The foregoing examples are representative of dozens of such complaints made known to Plunge that were traceable to Cover Genius' purposeful warranty maladministration.

43. On September 18, 2026, Plunge's Chief Operating Officer emailed Cover Genius to provide notice of Plunge's "serious concerns about the handling of Plunge customers' XCover claims and the resulting harm to Plunge." Plunge's email stated:

> Our team has repeatedly requested claim updates, explanations of partial approvals, and help resolving account issues in our shared channel. From September 11 through September 18, we found no Cover Genius response to those requests. Several of the underlying claims have been pending since July or August. Customers are also reporting unanswered inquiries, repeated documentation requests, and uncertainty about approvals and payments.
>
> This breakdown is affecting Plunge directly. Customers are directing complaints, negative reviews, and threats of legal action at Plunge. Our service and legal teams are spending time addressing these disputes and explaining the parties' responsibilities, while customers remain unable or unwilling to proceed with repairs. These issues are disrupting repair activity and damaging customer relationships.

The email further requested, among other things, that Cover Genius resolve outstanding customer claims and identify corrective steps Cover Genius would implement.

44. In subsequent communications, Cover Genius sidestepped Plunge's warranty administration concerns, instead (i) reiterating demands to audit Plunge and (ii) reiterating complaints about its increased claims costs incurred since Plunge began properly to invoice Cover Genius in late 2025. Cover Genius further advised Plunge on September 28, 2026 that Cover Genius would be "engaging its own repair network" to service open and future warranty claims without Plunge's input on how claims should be handled. However, Cover Genius has continued to neglect and maladminister Plunge customer's warranty claims and Plunge's customers continue to criticize Plunge and demand Plunge's intervention or assistance.

45. Since May of 2026, and continuing to the present, Cover Genius has purposefully and persistently delayed or evaded communicating its approval of customers' covered warranty repair claims, creating a trap for unwary Plunge customers. Many customers do not appreciate that the Cover Genius warranty protection plan excludes coverage for "[a]ny unauthorized repairs and/or parts." *See* Exhibit 2, Exclusions, Section 13(n). The overwhelming number of needless and unexplained delays indicates Cover Genius' intent that Plunge customers frustrated by claims delays will pay for their own repairs before obtaining approval from Cover Genius, allowing Cover Genius to avoid responsibility for otherwise valid customer claims.

46. Cover Genius also manipulates the approval of recommended repairs, in a scheme designed to limit its claim costs, to avoid future valid warranty claims, and to deceive the customer into thinking that Plunge is at fault. Specifically, Cover Genius lacks the expertise and technical network to diagnose mechanical or electrical problems underlying warranty customers' claims, and thus relies on Plunge engineers to do so. But since May of 2026, XCover has persistently

disparaged Plunge's diagnosed and recommended repairs to customers, or misled Plunge customers about the recommended repairs, in order to manipulate claim outcomes. For example:

a. Plunge frequently (and necessarily) recommends solving the customer's problem through repair or replacement of a series of parts. But Cover Genius falsely (and without supporting expertise) advises the customer, by way of examples, that Plunge's diagnosis and recommendation has "redundancies," includes "excessive charges," "lacks the necessary technical justification," or includes "an over-bundled scope of replacement parts based solely on a remote assessment." Cover Genius will then improperly deny the warranty claim, or instruct the customer to return to Plunge or pay to hire a third party technician to re-diagnose the problem. This understandably angers Plunge's customers (as seen by the examples below).

b. Cover Genius will frequently approve only part of the entire Plunge-recommended course of repair. For example, where Plunge recommends that a customer's unit requires a new pump, fittings, and filter housing, XCover approves only a pump replacement and not the balance of the recommended work (intending to reduce its claim cost, not correctly administer the warranty claim). This course of action is destined to cause a repeat failure of the replaced pump—which Cover Genius then declares is Plunge's obligation to repair under Plunge's 90-day warranty for replaced parts. Cover Genius has repeated some version of this scheme numerous times in recent months.

47. In connection with the foregoing misconduct, Cover Genius frequently peppers its claims communications with deceptive false statements leading customers to believe that Plunge causes or participates in these frustrating claims decisions and delays. This includes Cover Genius' repeated (false) references to such delays or decisions supposedly being made by "our partner Plunge." For example:

a. On October 13, 2026, Cover Genius support wrote to a Plunge customer about his long-pending warranty claim: "Your claim is being assessed by our partner Plunge. Please refer to them for any assistance related to the status of the claim." That statement was false. Plunge had already given the customer its diagnostic assessment and invoice to provide to Cover Genius, and Plunge had thereafter repeatedly reminded Cover Genius to act. Plunge does not make coverage determinations; Cover Genius alone decides coverage, as its own written process states. This customer's claim, filed

September 18, 2026, remained open with no Cover Genius decision as of October 21, 2026.

b. On October 8, 2026, an XCover representative falsely told a Plunge customer that her long-pending claim was "being assessed by our partner Plunge." Plunge was not assessing her claim, which she filed on September 13, 2026 and which remained open with no coverage decision by Cover Genius.

c. On March 27, 2026, XCover told a Plunge customer: "According to our records, there are no claims submitted via our website XCover.com. In order for us to assist you, could you please confirm if the claim has been submitted via our partner Plunge? If the claim has been submitted via our partner's system, feel free to reach out to them for any enquiry related to the claim." Plunge has no claim system and does not administer claims. Cover Genius wrongly implied otherwise and sent the customer back to Plunge, causing further delay.

48. These are representative examples of a long course of such misconduct by Cover Genius. They are not accidental—Cover Genius knows its own process and rules—but instead intend to deceive. Cover Genius knows and intends that many warranty claimants frustrated by the run-around and delay will either abandon their claims or pay Plunge to fix their tub (allowing Cover Genius to avoid paying for the repair as one "unauthorized" by Cover Genius) all while the customer blames Plunge and not Cover Genius.

49. This entire course and pattern of behavior by Cover Genius harms Plunge's brand and customer relationships. By way of example, on September 25, 2026, a Plunge customer posted the following 1-star review on Trustpilot, attributing XCover's warranty maladministration to Plunge :

> Sep 25, 2026
>
> **I purchase my unit back in 2023 and the...**
>
> I purchase my unit back in 2023 and the chiller died in 2025. Plunge was so helpful and personal they took care of everything having to do with the warranty. Well....... the 2nd chiller stopped cooling. I experience and completely different company ( they rely on AI and email not the in person experience anymore AT ALL). It took to many emails , had to pay for the parts and service up front and now I am awaiting a response from the warranty company , who by the way does not make it easy at ALL! If had to buy another plunge I WOULD NOT buy from them again. TERRIBLE customer services now ...to many processes to go through with no personal touch. Their personal touch is what made them before and now they got rid of it.
>
> September 25, 2026 Unprompted review
>
> Useful 2 Share

50. Similarly, on October 3, 2026, a Plunge customer published this poor review on Trustpilot, attributing XCover's warranty maladministration to Plunge:

Oct 3, 2026

**Extremely Disappointed With Plunge and...**

Extremely Disappointed With Plunge and Their Protection Plan

I'm extremely disappointed with my experience with Plunge and, in particular, how issues with my unit are being handled.

This is not the first problem I've had with my Plunge. I previously had an issue with the chiller breaking, which was already frustrating and required dealing with customer service and getting the issue resolved.

Now I'm dealing with another significant problem, and the way Plunge is handling it has been even more disappointing.

When I purchased my Plunge, I also purchased the XCover Protection Plan – $5,000-$7,499.99 / 5 Year, which cost me $676.99. I purchased this protection specifically for peace of mind in case something went wrong with the equipment.

Instead, I'm now being told that I need to pay approximately $3,300 out of pocket and then wait up to 25 days for XCover to handle the claim.

That is extremely frustrating. If I paid $676.99 for a five-year protection plan, I expected the process to actually provide meaningful protection when I needed it. Being asked to come up with another $3,300 myself and then wait weeks for the claim to be processed does not feel like the protection I believed I was purchasing.

Between the previous chiller failure and now this latest issue, I'm questioning the value of both the equipment and the protection plan.

I understand that insurance/protection-plan claims can have procedures and processing times, but customers should not be left in a position where they have already paid a substantial amount for protection and are then expected to front thousands of dollars while waiting weeks for the claim to be addressed.

I hope Plunge takes responsibility for helping resolve this situation rather than simply directing me to XCover. I purchased the protection plan through Plunge with the expectation that it would provide coverage when something went wrong.

At this point, I'm extremely disappointed with the product reliability, the customer service experience, and the way this protection-plan situation is being handled.

September 25, 2026 Unprompted review

Useful 2 Share

51. Similarly, on October 5, 2026, a Plunge customer posted a lengthy poor review on Trustpilot, complaining about the XCover warranty administration:

> My Plunge failed and I have an active extended warranty that I purchased through Plunge. What followed has been an unbelievable runaround between Plunge, XCover, and Clyde.
>
> I followed the warranty process, opened the claim, obtained the repair quote from Plunge, and provided the requested information. Instead of getting a decision, I have spent weeks being bounced between companies.

He concluded his review as follows:

> Plunge has apologized and explained that it cannot control the third-party administrator. That explanation does absolutely nothing for the customer sitting with an unusable product and a paid warranty that he cannot effectively access.
>
> This experience has destroyed my confidence in Plunge. I can tolerate a product having a problem. Products break. What determines whether I remain loyal to a company is what that company does when its product breaks.
>
> Until this happened, I expected my next cold plunge to be another Plunge and was seriously considering purchasing a sauna from them as well. I cannot justify spending thousands of dollars more with a company when my experience has shown me that, if something goes wrong, I may be left chasing third-party warranty companies while Plunge explains why the problem is outside its control.
>
> For anyone considering purchasing from Plunge—particularly purchasing an extended warranty—I would strongly recommend understanding exactly who will stand behind that warranty and what happens if the administrator stops responding.
>
> Because right now, despite purchasing the warranty through Plunge and doing everything asked of me, I still have a broken Plunge and no functioning path to get my warranty claim resolved.
>
> October 5, 2026 Unprompted review
>
> Useful 2 Share

52. On October 18, 2026, a Plunge customer left this poor review traceable to XCover's maladministration:

Oct 18, 2026

**I purchased my Plunge in August 2023...**

I purchased my Plunge in August 2023 and was very happy with it until recently. Unfortunately, on August 23rd, the motor stopped working. Thankfully, I had purchased the XCover 3-year warranty at the time of purchase, expecting that it would provide peace of mind if something went wrong.
I contacted Plunge customer support, provided the requested pictures and videos, and they confirmed that the motor had failed. I was then directed to file a claim with XCover. Nearly two months later, I have yet to receive a single response from the warranty company.
When I followed up with Plunge, I was told they could not do anything further to assist with my claim. My only options are to wait indefinitely for a response from XCover or purchase the replacement equipment myself at a cost of more than half of what I originally paid for the entire unit, hoping that the warranty company will eventually agree to reimburse me.
While I was initially very pleased with my Plunge, this experience has been incredibly disappointing. A warranty is supposed to provide peace of mind and protection when a product fails, not leave a customer without a working product for months with no communication or resolution.
As a physician who owns a wellness and longevity practice, I have recommended Plunge to numerous patients and even featured the company under the "Products We Love" section of our practice website. I made those recommendations because I believed in the product and felt confident standing behind it.
Unfortunately, this experience has significantly changed my opinion. I will be removing Plunge from our website and can no longer confidently recommend it to my patients when the warranty process has left me without a functioning product and no clear path to resolution.
It is truly disappointing when a company whose product you have genuinely enjoyed leaves you feeling unsupported when something goes wrong. The quality of a company's customer service and its handling of warranty issues matter just as much as the product itself. I hope Plunge and XCover take situations like this more seriously and improve the experience for their customers.

August 23, 2026 | Unprompted review

Useful 3 Share

53. On November 9, 2026, a Plunge customer left this poor review:




54. The foregoing customer complaints represent only a fraction of similar complaints Plunge has received or seen online, with increasing and unrelenting frequency, since May of 2026.

55. Plunge has suffered economic loss and incalculable brand damage attributable to Cover Genius' misconduct since May of 2026. Plunge's actual tub sales as a share of planned product sales has fallen every quarter since the second quarter of 2026 (76% in Q2, 65% in Q3 and 59% in Q4). And based on Plunge's analysis, over the same time period, the average rating of new Trustpilot Plunge reviews (on a scale of 1 to 5) fell from 4.05 (Q2) to 3.10 (Q3) and then to 1.74 (Q4). Additionally, Plunge's poor (1 or 2 stars) Trustpilot reviews that reference an extended-warranty claim rose from an average of 1 per month before May of 2026, to approximately 6 per month in Q4 of 2026.

56. Cover Genius' ongoing course of action presents significant and longstanding risk of harm to Plunge and its consumer customers, in New York and throughout the country. As of the filing of this action, Cover Genius still owes obligations to Plunge customers arising from more than 14,000 outstanding extended warranty protection plans sold during the term of the Order Form agreement (493 of which were sold to New York consumers).

## FIRST CLAIM FOR RELIEF
**False Association—Lanham Act 15 U.S.C. § 1125(a)(1)(A)**

57. Plunge incorporates the foregoing allegations as if fully restated herein.

58. Plunge owns and uses in commerce the name and registered trademark "Plunge" in connection with manufacturing and selling cold plunge tubs and other related consumer products directly to consumers throughout the United States and internationally.

59. The "Plunge" name and trademark are valid and entitled to protection, covered by United States Trademark Registration No. 7,805,919. Attached is a copy of Plunge's Certificate of Registration.

60. Plunge has used and promoted its "Plunge" mark extensively and has built and developed the goodwill and reputation associated with its trademark rights.

61. In connection with the sale and administration of its Clyde and XCover extended warranty protection plans, Cover Genius used the Plunge name and mark in interstate commerce in written communications to Plunge's customers.

62. Cover Genius' use of the Plunge name in its statements, representations, and omissions to consumers was likely to cause, and did cause, confusion, mistake, and deception among consumers as to the affiliation, connection, or association of Plunge with Cover Genius, and it specifically caused confusion and mistake amongst consumers as to Plunge's sponsorship, approval, control of, or responsibility for Cover Genius' claims-administration processes, decisions, and services, all as alleged above.

63. In its communications to Plunge's customers, Cover Genius used the "Plunge" name and mark in a manner that constitutes a false designation of origin, a false or misleading description of fact, and a false or misleading representation of fact within the meaning of 15 U.S.C. § 1125(a)(1).

64. Cover Genius falsely designated Plunge as the origin of, and the party responsible for, Cover Genius' own wrongful claims-administration services and coverage decisions. It did so by, among other things, (a) expressly attributing responsibility for its own invalid claim assessments and outcomes to Plunge, and (b) redirecting customers to Plunge to resolve claims that Cover Genius alone administered and decided.

65. Through these statements, Cover Genius falsely associated its claim outcomes and coverage decisions with Plunge, and conveyed to consumers that Plunge, not Cover Genius, was a source of those decisions, all as alleged and exemplified at ¶¶ 5, 47-48 herein.

66. For example, Cover Genius made the following false statements directly to Plunge customers:

a. "Your claim is being assessed by our partner Plunge. Please refer to them for any assistance related to the status of the claim."

b. "Your claim is being assessed by our partner Plunge."

c. "[Y]our claim has been submitted directly via our partner plunge at hiclyde.com and not via our website XCover.com. As we do not have access to claims submitted via our partner's systems and for any further information regarding the status of your claim, we recommend you to reach out to plunge directly."

d. "We note that the intended repair of your item by our authorized service provider, Plunge, was not successfully completed and that the reported issue persists. … [R]epairs conducted by Plunge are subject to a 90-day warranty. … [T]he established protocol requires you to contact Plunge directly for a follow-up service visit … Plunge is fully aware of this warranty procedure and should manage the completion of your repair."

67. Each of these statements falsely represented, expressly or by necessary implication, that Plunge sponsors, approves, administers, controls, or is responsible for Cover Genius' claims administration and decisions (which Cover Genius knew to engender unhappiness with the customers).

68. Cover Genius' statements and representations were literally false. To the extent any statement or representation was factually accurate or truthful, it was misleading in context, because it conveyed to consumers the false message that Plunge—not Cover Genius—was responsible for the denial, reduction, delay, and/or redirection of their claims under the extended warranty protection plan.

69. Cover Genius made these false and misleading statements and representations in repeated and standardized written communications to numerous Plunge customers throughout the United States.

70. Plunge need not plead or prove that Cover Genius intended to mislead, confuse or deceive in order to establish liability under 15 U.S.C. § 1125(a)(1)(A). Nonetheless, Cover Genius acted knowingly, willfully, and in bad faith, all as alleged herein.

71. Cover Genius' willfulness is further shown by its statements to Plunge that its claims-handling tactics "would hurt you [Plunge] more than us [Cover Genius]"as alleged herein, and by its continuation of these practices after September of 2026, when Plunge put it on notice of the resulting harm.

72. Plunge's customers were in fact confused, mistaken, and/or deceived by Cover Genius about the relationship between Plunge and Cover Genius. As alleged herein, numerous Plunge customers acted on Cover Genius' false and misleading representations of fact by turning to Plunge to resolve claims that only Cover Genius could decide, directing their claim inquiries, demands, and frustration to Plunge because Cover Genius told them Plunge was responsible. Those customers falsely and mistakenly believed Plunge controlled Cover Genius' claim decisions.

73. The customer complaints alleged herein concern Cover Genius' claim administration and coverage decisions, not the quality or accuracy of Plunge's diagnoses or its

repair recommendations. In many instances, Cover Genius' coverage decision was itself a (groundless) rejection of Plunge's diagnosis, as alleged and exemplified at ¶¶ 46(a)–(b) herein, communicated by Cover Genius in a manner causing customers to blame Plunge for Cover Genius' decisions. And in many instances customers did blame Plunge, because Cover Genius falsely told them that Plunge was assessing, deciding, or responsible for advancing their claims (*See* ¶¶ 5, 47-56).

74. Cover Genius' repeated statements and representations to consumers have caused injury to Plunge's commercial interests in its reputation and sales, and has directly caused consumers to withhold trade from Plunge, including by, for example, (a) declining to purchase additional products or accessories from Plunge; (b) declining or ceasing to recommend Plunge to others; and (c) publishing negative reviews that deter other prospective purchasers, for example, as specifically alleged and exemplified at ¶¶ 39-41, 46-53 herein.

75. As a direct and proximate result of Cover Genius' violations of 15 U.S.C. § 1125(a)(1)(A), Plunge has suffered and will continue to suffer damages, including lost sales and profits and injury to its goodwill and reputation, in an amount to be proven at trial.

76. Plunge is entitled to recover, subject to the principles of equity, Cover Genius' monetary gains and profits, any damages sustained by Plunge, and the costs associated with the filing of this action under 15 U.S.C. § 1117(a). Plunge is further entitled to recover any other damages this Court deems just and proper as a result of its assessment under 15 U.S.C. § 1117(a).

77. Because Cover Genius acted knowingly and willfully to harm Plunge, Plunge is also entitled to enhanced damages as the Court finds just and proper, and to a determination that this is an exceptional case warranting an award of reasonable attorney's fees under 15 U.S.C. § 1117(a).

78. Cover Genius' conduct is continuing as of the date of this Complaint. Unless enjoined, it will continue to cause Plunge irreparable harm to its reputation and goodwill, for which Plunge has no adequate remedy at law. Plunge is entitled to preliminary and permanent injunctive relief under 15 U.S.C. § 1116, enjoining Cover Genius from stating or implying to consumers that Plunge assesses, decides, controls, or is responsible for Cover Genius' claims decisions under the extended warranty protection plan.

**SECOND CLAIM FOR RELIEF**
**Unfair Competition**

79. Plunge incorporates the foregoing allegations as if fully restated herein.

80. Plunge has a protectable property interest in its "Plunge" name and registered trademark (U.S. Reg. No. 7,805,919) and in the goodwill and reputation associated with that name and mark.

81. Plunge built that goodwill through years of manufacturing, marketing, selling, and servicing its cold plunge tubs and other related consumer products, and through substantial investment of labor, skill, and expenditure.

82. As such, Plunge's customers associate the "Plunge" name and mark with Plunge's products and service.

83. In its written communications with Plunge's customers, Cover Genius used the "Plunge" name to represent, expressly or by necessary implication, that Plunge sponsors, approves, administers, controls, or is responsible for Cover Genius' claims-administration processes, coverage decisions, and services.

84. Cover Genius' use of the Plunge name and mark in communication with consumers, as alleged herein, was likely to cause, and did cause, confusion and mistake amongst consumers as to the affiliation, connection, or association of Plunge with Cover Genius. Those

communications also caused confusion as to the origin and source of Cover Genius' claims and coverage decisions. Customers falsely and mistakenly attributed Cover Genius' claims and coverage decisions to Plunge. Customers also published reviews blaming Plunge for Cover Genius' warranty administration.

85. Cover Genius misappropriated Plunge's name, mark, and goodwill for Cover Genius' own commercial advantage. Cover Genius intentionally associated its claims-administration services and decisions with Plunge. It used the trust that Plunge's customers place in the Plunge brand to lend credibility to Cover Genius' denials, reductions, delays, and redirections of covered claims. It also shifted onto Plunge the customer dissatisfaction, reputational cost, and service burden that Cover Genius' own decisions generated. Cover Genius thus used Plunge's goodwill as a resource to support Cover Genius' scheme designed to limit (or redirect) its claims costs and to evade its warranty obligations. In doing so, it depleted that goodwill and appropriated the benefit for itself.

86. Specifically, Cover Genius gained a commercial advantage from its misappropriation, including by: (a) significantly lowering its claims paid and claims costs in sharp decline from at least May of 2026 to the present; (b) making its denials and reductions of covered claims appear to come from, or be endorsed by, the manufacturer, which made customers less likely to challenge them, escalate them, or seek remedies against Cover Genius; and (c) avoiding the reputational harm and customer attrition that would otherwise attach to Cover Genius and its XCover and Clyde protection-plan offerings.

87. Cover Genius Cover Genius acted knowingly, willfully, and in bad faith, as alleged and exemplified herein. Cover Genius knew its statements to consumers were false or misleading

when it made them, and it made them intentionally to divert the consequences of its own claim decisions onto Plunge, successfully avoiding payment of covered claims.

88. As a direct and proximate result of Cover Genius' unfair competition, Plunge has suffered and will continue to suffer injury in an amount as yet undetermined but to be proven at trial, including (a) loss of goodwill and damage to its reputation; (b) lost sales and profits, and (c) costs incurred to respond to customers misdirected to Plunge for claims administration and decisions.

## THIRD CLAIM FOR RELIEF
## Tortious Interference with Prospective Business Relations

89. Plunge incorporates the foregoing allegations as if fully restated.

90. Plunge had existing and prospective business relationships with its customers, including continuing purchases of additional products and accessories, and referrals.

91. Plunge's existing and prospective business relationships include customers that bought a Plunge product and a Clyde or XCover protection plan administered by Cover Genius, and had a continuing relationship with Plunge as the manufacturer of the product.

92. Plunge reasonably expected that relationship to produce additional sales, profits, service revenue, promotion and referrals.

93. Cover Genius knew of Plunge's existing and prospective relationships. As the administrator of protection plans sold with Plunge products, Cover Genius knew that each claimant was a Plunge customer, knew what product each customer had purchased, and knew that Plunge depended on those customers for business, service revenue, and maintaining its goodwill and reputation.

94. Cover Genius also knew of Plunge's after-sale relationships with these customers through its own communications with Plunge about specific customers and claims.

95. Cover Genius intentionally interfered with those customer relationships through misrepresentations to Plunge's customers, in which it falsely represented that Plunge assessed, decided, controlled, or was responsible for Cover Genius' wrongful claim decisions, and redirected those customers to Plunge for claims that Cover Genius was solely responsible for administering and deciding, as specifically alleged and exemplified at ¶¶ 47-48 herein.

96. Cover Genius' misrepresentations falsely described the roles of Plunge and Cover Genius under the extended warranty protection plans, and Cover Genius made those statements intending that customers would rely on them. Customers did rely on them and then directed their dissatisfaction, complaints, and demands to Plunge, rather than to Cover Genius.

97. Cover Genius has also repeatedly disparaged the quality, integrity, and reliability of Plunge's products and business practices directly to Plunge customers, specifically including persistent disparaging statements made by Cover Genius concerning Plunge's diagnosed and recommended repairs for its own products in order to manipulate claim outcomes, as specifically alleged and exemplified at ¶¶ 4, 46-48 herein.

98. Cover Genius' misrepresentations and other interfering conduct, including the extreme economic pressure that conduct created, injured Plunge's relationships with its customers. Those customers include specific customers who otherwise would have done further business with Plunge but have expressly declined to do so. Examples of the specific harm Plunge has suffered as a direct and proximate result of Cover Genius' tortious interference are alleged at ¶¶ 49–56 herein.

99. As a direct and proximate result of Cover Genius' tortious interference, Plunge has suffered damages in an amount as yet undetermined but to be proven at trial.

## FOURTH CLAIM FOR RELIEF
**Deceptive Acts and Practices—N.Y. Gen. Bus. § 349**

100. Plunge incorporates the foregoing allegations as if fully restated.

101. Cover Genius's conduct was consumer-oriented.

102. Cover Genius administers extended-warranty protection plans sold to members of the consuming public who buy Plunge products.

103. In making its claims decisions, Cover Genius communicates directly with Plunge's customers in New York and across the United States.

104. Certain of Cover Genius' communications to consumers were likely to materially mislead or deceive a reasonable consumer acting reasonably under the circumstances.

105. Cover Genius represented to consumers, expressly or by necessary implication, that Plunge assessed, decided, controlled, or was responsible for Cover Genius' claim determinations, and redirected consumers to Plunge for claims that Cover Genius alone was responsible for administering and deciding.

106. Specifically, Cover Genius made the following materially misleading or deceptive statements to New York consumers:

a. **NY Customer A** reported to Plunge on September 6, 2026 that his cold tub unit was not cooling. Plunge completed its technical diagnosis and sent NY Customer A its repair quote on September 15, 2026. Plunge explained to NY Customer A in writing: "Only the third-party administrator can decide claim coverage, benefit amount, and reimbursement under the governing plan." NY Customer A then filed his claim with Cover Genius. On or about October 13, 2026, Cover Genius (from the support@joinclyde.com email address, writing as "Will from the XCover team") told NY Customer A: "Your claim is being assessed by our partner Plunge. Please refer to them for any assistance related to the status of the claim." On or about October 13, 2026, Cover Genius told NY Customer A to obtain claim status information from Plunge: "Please refer to them for any assistance related to the status of the claim." At the time it made those statements to NY Customer A, Cover Genius knew they were false and misleading. Plunge was not assessing the claim. Plunge had no access to Cover Genius' claim system, and had no authority to decide

NY Customer A's claim. As of October 30, 2026, the claim remained "Under Review" with no claim decision from Cover Genius.

b. **NY Customer B** purchased a $676.99 five-year protection plan from Cover Genius. He filed a claim on August 20, 2026. The next day, Cover Genius sent NY Customer B an email that said: "Please do not respond to this email. The inbox is unmonitored. Please visit the Claims Center for updates about your claim. *** To get started, please contact Plunge to discuss your options and arrange the service[]", directing the customer to Plunge on a claim that Cover Genius alone has the authority to assess and decide. And a Plunge engineer had already evaluated NY Customer B's issue and had quoted approximately $5,000.00 in replacement parts. Cover Genius' most recent message to NY Customer B, on November 6, 2026, said, "we are still assessing your claim." As of November 13, 2026, eighty-five days after the claim was filed, Cover Genius' records available through its Claims Center still showed the claim as "Under Assessment" with no claim decision.

107. The same templated statements directing claimants to Plunge also went to, at least, four other New York customers between June and August 2026, in East Hampton, Oyster Bay, New Rochelle, and Rochester.

108. Each of the aforementioned materially misleading or deceptive statements from Cover Genius communicated to the consumer, expressly or by necessary implication, that Plunge was assessing, partnering in, or responsible for advancing a delayed claim that Cover Genius alone controlled and decided.

109. Each of the aforementioned materially misleading or deceptive statements from Cover Genius were made in standardized, template-based, and repeated written communications to numerous consumers who submitted claims under those plans.

110. Each of the aforementioned consumers bought a protection plan administered by Cover Genius, submitted a claim, and were materially misled or deceived by Cover Genius' communications in New York.

111. The aforementioned materially misleading or deceptive statements to consumers in New York (like statements it made to consumers across the United States) were material, because

they concerned purported confirmation of who decides consumers' extended warranty claims, whom consumers must contact to obtain the coverage they paid for, and who is responsible when a claim is denied, reduced, or delayed. A reasonable consumer would rely on that information in deciding how to pursue a claim, whether to challenge a denial, and whether to do further business with Plunge, the manufacturer of the product.

112. Cover Genius' conduct therefore had an impact on consumers in New York.

113. Consumers were in fact misled and falsely attributed Cover Genius' claim decisions to Plunge.

114. Plunge was injured as a result of Cover Genius' materially misleading or deceptive acts, including through lost sales, diverted business, and harm to its goodwill and reputation.

115. Plunge is entitled to recover its actual damages under N.Y. Gen. Bus. § 349(h), and further entitled to an order enjoining Cover Genius from stating or implying to consumers in New York that Plunge assesses, decides, controls, or is responsible for Cover Genius' claim decisions or claims-administration under its extended warranty protection plans.

116. Because Cover Genius willfully and knowingly violated N.Y. Gen. Bus. § 349(h), Plunge is further entitled to enhanced damages and recovery of reasonable attorney's fees.

**WHEREFORE**, Plunge respectfully prays for and requests the Court:

1. Enter judgment for Plunge and against Cover Genius on all claims;

2. On Count I, award Plunge Cover Genius' monetary gains and profits and Plunge's monetary damages in an amount to be proven at trial, including costs, enhanced damages, reasonable attorney's fees and preliminary and permanent injunctive relief;

3. On Counts II and III, award Plunge's monetary damages in an amount to be proven at trial;

4. On Count IV, award Plunge's monetary damages in an amount to be proven at trial, injunctive relief, enhanced damages and reasonable attorney's fees;

5. Grant injunctive relief in favor of Plunge, enjoining Cover Genius from stating or implying to any Plunge consumers that Plunge assesses, decides, controls, or is responsible for Cover Genius' claims decisions or claims-administration under any of its extended warranty protection plans.

6. Grant such further relief as the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Plunge demands a trial by jury on all issues so triable.

New York, New York
November 16, 2026

Respectfully submitted,

**LEWIS BRISBOIS BISGAARD & SMITH LLP**

Stephen G. Rickershauser, Esq.
140 Broadway, Suite 3100
New York, New York 10005
Telephone: 212.232.1300
Stephen.Rickershauser@lewisbrisbois.com

John F. Hill (0039675) *(Pro Hac Vice application forthcoming)*
Meleah M. Skillern (0096077) *(Pro Hac Vice application forthcoming)*
1 Gojo Plaza, Suite 310
Akron, Ohio 44311
Telephone: 330.272.0000
Fax: 330.272.0019
John.Hill@lewisbrisbois.com
Meleah.Skillern@lewisbrisbois.com

*Counsel for Plaintiff Reboot Labs, LLC dba Plunge*